# CHARLESTON.

CHARLES JANKEY *v.* HOPE NATURAL GAS COMPANY.

Submitted May, 10, 1922.   Decided May 30, 1922.

1.  MASTER AND SERVANT—*Evidence of Change in Location of Machinery After Accident Inadmissible.*

    In an action for damages to an employee caused by an explosion in a gas compressor station, based on the neglect or failure of the employer to provide for him a reasonably safe place to work, it is error to admit evidence showing that shortly after the explosion the employer changed the location of parts of the machinery, which, by reason of its original location, may have contributed to the injury. (p. 313).

2.  EVIDENCE—*In Action for Personal Injuries Resulting from Explosion Held That Witness Could Give his Opinion as to its Cause Together with the Basic Facts.*

    In an action for personal injury to an employee, caused by an explosion in a line in which compressed air was used as a "starter," to start the gas compressor engines in a gas compressor station, one experienced in the repair or opera-

tion of the machinery, and who was present at the time of the explosion, or immediately afterwards, may give his opinion as to what caused the explosion and how it was caused, after stating the facts upon what he bases his conclusions, the average juror not being familiar with the complicated machinery and its complex movements, and it being impossible for the witness otherwise to make the facts and conditions ineelligible to the jury.  (p. 315).

3.  SAME—*In Servant's Personal Injury Action Held That Witness Could State His Opinion as to Whether Explosion was Caused by Mixture of Natural Gas and Air.*

And the witness, so qualified, after showing how natural gas may have got into the air line and that there was nothing in or about the compressor station but a mixture of natural gas and air that could have caused the explosion, may state in his opinion whether the explosion was caused by a mixture of natural gas and air in the air line.  (p. 316).

Error to Circuit Court, Marion County.

Action by Charles Jankey against the Hope Natural Gas Company for personal injuries.  Judgment for the plaintiff and the defendant brings error.

*Reversed and remanded.*

*A. B. Fleming, Charles Powell* and *Kemble White,* for plaintiff in error.

*Harry Shaw* and *Frank C. Haymond,* for defendant in error.

MEREDITH, JUDGE:

Plaintiff, an employee of the Hope Natural Gas Company, was injured by an explosion occurring at defendant's gas compressor plant, known as Wright's Station, recovered a judgment against defendant in the circuit court of Marion County for $8000, and defendant obtained a writ of error.

This station is used for compressing gas.  It consisted of a main building and a smaller building located some 50 or 75 feet therefrom.  In the smaller building there was a machine shop room and an auxiliary room, which were separated by a partition.  In the main building were seven large gas engines, five of 350 and two of 450 horse-power; in the

auxiliary room there were two small gas engines, one of 25 horse-power used to drive a water pump and electrical generator, and another of 15 horse-power used to drive an electrical generator and air compressor. An air line, partly 3 inch and partly 2 inch, ran in part underground from the auxiliary room over into the main building where the large gas engines were, and was connected to each of the engines to supply them with air as a "starter". This was done by opening a valve on the engine and letting the air flow into the cylinder to make the flywheel roll, so the engine would start with gas, the air being shut off when the engine started firing enough to keep up its own speed. The air pressure usually carried on this line was from 120 to 125 pounds, but it could carry 150 pounds. The intake for this air was a flange with a 4 inch opening on the air compressor in the main building. A natural gas fuel line, independent of the air line, fed the gas at about an eight ounce pressure to each of the seven large gas engines, there being connected to each of the seven gas engines an air line and also a fuel line, parts of the air system and parts of the fuel supply system, each system, however, being wholly disconnected from the other.

There was a connection on the auxiliary engine in the auxiliary room made specially for starting the auxiliary engine by gas pressure, when the air was low or exhausted. This consisted of a temporary gas line from the main gas line on the outside of the auxiliary room and connected the main gas line to the auxiliary engine for the purpose of starting the auxiliary. A union was provided in the line to disconnect it from the main air system. The auxiliary engine sometimes was started by gas pressure, and one witness states it was so started the day preceding the accident.

On April 14, 1919, the plaintiff, who had been engaged in painting the ceiling and doing some other work in the main building, at quitting time went over to the auxiliary room where there were lockers in which the workmen kept their clothes, and while he was changing his clothing, an ell on the air line under the concrete floor of the auxiliary room blew

off.   The force of the explosion upheaved the floor, hurling
the plaintiff in the air and he fell on the jagged concrete,
breaking his left leg and otherwise injuring him.   The air
line pipe does not seem to have been burst, but numerous
fittings at other points on it were blown off, and the line
was torn up in about seven places.   A line was burst in the
main building, near two of the large gas engines, and there
were other minor injuries to the air system, but the large
gas engines in the main building were not injured, though
disabled for want of air with which to start.

Plaintiff charges that the defendant:   (1) negligently
employed and kept incompetent officers, agents and employees
in and about the place of his employment; (2) negligently
failed to make, promulgate and enforce proper rules and regu-
lations; and (3) negligently failed to provide a reasonably
safe place for plaintiff to work; he relies mainly upon the
third ground to sustain the judgment.   The declaration
further avers that the defendant had not elected to pay into
the Workmen's Compensation Fund, and that therefore it
was not entitled to avail itself of any of the common law
defenses, such as the fellow-servant rule, assumption of risk,
contributory negligence, or any defense that the negligence
in question was that of some one whose duties were prescribed
by statute.   Defendant pleaded the general issue.   It pro-
duced no witness to prove the cause of the explosion, but con-
fined its evidence solely to proving that it was engaged at the
time of the accident in both intra-state and inter-state com-
merce.

The facts in the case are by no means clear.   This is appar-
ent from the statement of the case gleaned from the testimony
of the witnesses and statements in briefs of counsel.   For
example, a witness as well as counsel state that the air com-
pressor was in the main building.   There is no evidence that
any air storage tank was used, but from our limited knowledge
of gas compressor stations we can not believe that the air
compressor was in the main building, but that the witness
meant that the air storage tank was located there.   The plain-
tiff was very much in the dark in making out his case, as he

was compelled to rely largely upon employees of defendant for his evidence, and defendant vouchsafed no information. If it knew what caused the explosion it did not inform any one. As to what caused the explosion it would be improper for us to express an opinion, and we will confine ourselves to the points relied upon by counsel for reversal.

Plaintiff undertakes to account for the explosion by a process of elimination; that it could not have occurred had there not been an explosive mixture of natural gas and air in the air line; that natural gas could have passed into the air line in three ways, one by being drawn in through the intake, as there was some gas constantly escaping in the main building; another by the improper use of gas—some witnesses say it was used in the air line to start the gas compressor engines when the air supply was low; and a third, by the use of gas, some say, to start the auxiliary gas engine when the air supply was low. If the gas was used to start the auxiliary, they say it might have leaked through into the air line through a union. We admit this expression is involved, but not more so than the testimony. There is no way in which the statements of the witnesses can be reconciled. We can not say from the record that gas was not used as a "starter" on the gas compressor engines when the air supply was low; one witness so states in effect, though the testimony is not clear, and we must confess that this statement is hard to believe. But however the gas became mixed in the air line, if this mixture was used to start the gas compressor engines, the witnesses account for the explosion by saying that the engine "backfired", causing a flame or spark to ignite the mixture and hence the explosion. They say there was nothing on the premises that could have caused the explosion but gas and air; that air in the air line at the pressure shown would not have caused it, and hence their conclusion that there was an explosive mixture of gas and air in it. We are not called upon to account for the explosion, but as the case will have to go back for a new trial, we suggest that a proper layout of the machinery and a description of its proper use and connection will help much to clarify the situation. We

can not condemn this elimination process, though it may be possible that more direct evidence might be obtained.

Defendant relies for reversal upon eleven assignments of error, but which may be grouped under four heads: (1) the admission of improper evidence; (2) the giving of improper instructions for plaintiff; (3) the refusal of certain instructions offered by defendant; and (4) the refusal of the court to·set aside the verdict and grant a new trial. We will discuss these in the order named.

First, as to the admission of improper evidence. This may be considered under two divisions: (1) evidence showing a change in the location of the intake to the air line after the accident; and (2) opinion evidence of witnesses as to the cause of the explosion.

(1). It was shown by a number of witnesses that a short time after the explosion the defendant's chief engineer at this station had the intake to the air line moved from a point in the main building to a point outside and about 60 or 75 feet away from the main building, with the open end in the open air. The engineer says this was done to obtain cooler air. This change, plaintiff's counsel doubtless argued to the jury, was a confession on defendant's part that the intake to the air line when the explosion occurred was in the wrong place; that gas was constantly escaping in the main building and consequently some of this gas was drawn through the intake into the air line, and that this gaseous·air was the explosive mixture which caused the explosion. Plaintiff's counsel do not so argue here. They now claim that the real purpose of showing this change was to show that the "location of the intake within the main building tended to cause the explosion or was one of the causes thereof", but if the·real purpose of this evidence was not to show a confession of negligence on the part of the defendant we can not see why it was introduced at all. If they desired to show that the intake was improperly located they could have done so in some other way by competent testimony. There was no controversy about the location of the intake at the time of the explosion; the jury did not see the premises and no maps or drawings were exhibited,

so we can see no valid reason for any evidence being admitted respecting the change. This case is fairly within the rule laid down in *Lay* v. *Elk Ridge Coal & Coke Co.*, 64 W. Va. 288, 61 S. E. 156, in which it was held that "In an action for damages to a servant, caused by defective appliances or lack of safety in the place in which the servant worked, evidence of the making of repairs or alterations immediately after the occurrence of the injury is not admissible." As is said in 29 Cyc. 616, "The reason for the rule is that the effect of declaring such evidence competent would be to inform a defendant that, if he makes changes or repairs, he does it under a penalty; for, if the evidence is competent, it operates as a confession that he was guilty of a prior wrong. True policy and sound reason require that men should be encouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed into an admission that they have been wrong-doers."

This view is fully sustained by the great weight of authority. 29 Cyc. 616, and cases cited; 1 Wigmore's Evidence, Sec. 283, and Supplement; *Lay* v. *Elk Ridge Coal & Coke Co.*, *supra; Hairston* v. *United States Coal & Coke Co.*, 66 W. Va. 324, 66 S. E. 473; *Alcott* v. *Public Service Corporation,* 78 N. J. L. 482, 32 L. R. A. (N. S.), Note, at page 1127. We adhere to our former decisions and hold that it was error to admit evidence of the change of the intake to the air line after the injury.

(2). Defendant claims that the facts showing conditions at Wright's Station, before, at the time of, and immediately after the accident were all made intelligible to the jury, and therefore the opinions of witnesses as to the cause of the explosion were inadmissible, relying on the cases of *Colebank* v. *Standard Garage Co.*, 75 W. Va. 389, 84 S. E. 1051; *State* v. *Sixo,* 77 W. Va. 243, 87 S. E. 267; *Lawrence* v. *Hyde,* 77 W. Va. 639, 88 S. E. 45; and other cases. In the Colebank case it was held error to permit witnesses to state in their opinion whether the speed of defendant's automobile at the time it injured plaintiff was unreasonable; they did not state the rate per hour the automobile was running, a point upon which they had a right to express an opinion; but without

stating facts upon which to base their conclusions, they gave their opinions as to whether the speed was reasonable or unreasonable; this was one of the very points in controversy, and had the same effect as if the witnesses had stated that in their opinion the defendant was guilty of negligence. In the case of *State* v. *Sixo*, it was held error to permit a witness to state whether in his opinion the words and figures appearing on a paper pasted on the outside of a basket in which it was charged the defendant was carrying liquor were printed or written in large display letters in the English language. The paper had been exhibited to the jury and they themselves could determine that question without the aid of the opinion of the witness, and whether the words and figures were so printed or written was the very question that the jury was required to determine. In the case of *Lawrence* v. *Hyde* it was held erroneous to permit a witness to give his opinion whether it was safe to lower small pieces of timber into a shaft by means of a chain looped around them and fastened to a rope operated by a hoisting engine, as the jury could determine whether that was a safe method as well as the witness. In the case of *Findley* v. *Railroad Co.,* 72 W. Va. 268, 78 S. E. 396, it was held that a non-expert witness who saw the stay bolts of a boiler immediately after, but not before it exploded, might testify that the broken ends of the bolts appeared to him to be old and rusty looking, but that he could not state that in his opinion they were broken before the explosion, or that they appeared to him to have been in bad condition before the explosion. Whether they were in bad condition or were broken before the explosion was a question for the jury. In the case of *State* v. *Dushman*, 79 W. Va. 747, 91 S. E. 809, where defendant was indicted for receiving stolen goods, knowing them to be stolen, it was held erroneous to permit a witness to state that he knew they were stolen because they were branded. The jury might draw this inference from the fact that the goods were branded, but the witness should not have substituted his own opinion for that of the jury.

But in the present case the facts showing the conditions before, at the time of, and immediately after the accident

at this gas compressor station were not made intelligible to the jury. In fact they were not made intelligible to the court, and from that arises the chief difficulty in this case. Defendant claims it was error to admit statements of the opinion of the witnesses, Alburn H. Toothman and A. R. Graham, as to the cause of the explosion. Toothman was in the machine shop, just in the rear of the auxiliary room, when the explosion occurred. He had been the engine repair man at this station for about two years. He testified that he had taken the gas engines down and put them together again so they would run. He showed himself familiar with the machinery of the plant and its operation. Graham was chief engineer at the station from 1913 to 1918, and at the time of the explosion was operating defendant's gasoline plant, located about 2000 feet away. He went immediately to the scene of the explosion and saw the conditions as they then existed. Due to his many years of experience, he was familiar with the machinery and its operation. Both witnesses were qualified to testify as experts. I Jones, Evidence, Sec. 380. They testified there was nothing about the plant that could have caused an explosion of this character, except a mixture of natural gas and air, and that in their opinion an ignition of such a mixture in the air line was what caused it. They also state as one of the reasons which led them to the conclusion that the explosion was so caused was that the air line was blown up in seven different places; that an explosion might be caused by an excessive pressure of air in the air line, but that in that event the line would have likely been blown up at but one point. These witnesses were personally acquainted with the conditions; while they did not assume to know absolutely that there was a mixture of gas and air in the line, yet from the facts known to them,—they state natural gas should not be permitted to enter into the air line,—that the line was blown up in seven different places instead of one, and that the explosion could have occurred from no other causes, they gave it as their opinion that it was caused by a mixture of natural gas and air in the air line, and that this was ignited by back-firing, or ignition from one of

the gas compressor engines. They did not state, as they could not state, that they knew gas escaped into the air line, but they did state the different ways in their opinion how it might have got there.

The ordinary person knows very little about the complicated machinery and operation of a gas compressor station; in fact there are very few persons, comparatively speaking, who know much, if any thing, about the construction and operation of such a plant. The machinery is complicated, and its movements are complex. Its parts and operation are extremely difficult to explain in terms that the ordinary person can understand; even the names of many of the parts do not mean any thing to the average person. They might be called by another name, and the average juror would not know the difference. We think that this is a case where expert testimony would be of peculiar value, and that the opinion of one experienced in the repair or operation of the plant, present at the time of the explosion, or immediately afterwards, and based on conditions as he actually knew them, as to what caused the explosion, was clearly admissible.

As is stated in 3 Wigmore, Evidence, Sec. 1976:

"A large class of cases, embracing statements as to the probability or the possibility of an event, the capacity or tendency of an act or machine, the cause or the effect of a fact, may fairly be grouped together, because the reason why the Opinion rule is urged against them is in general that the thing to which the witness testifies is not anything which he has observed, but is a quantity which lies in estimate only and is the result of a balancing of concrete data. This is no sufficient reason for excluding such statements; because it must always be impossible for a witness to reproduce in words absolutely all the detailed data which enter into his estimate, and there can be no danger in receiving such an estimate from a competent witness. All that can be said of the rulings is that probably some of them, in the final result of the litigation in hand, have done less actual harm to justice than the others have done."

The text is supported by many authorities cited, and we do

not think the cases cited by counsel for defendant apply here. In the case of *Snyder* v. *Wheeling Electrical Company,* 43 W. Va. 661, 28 S. E. 733, it was held that a physician, who examined the body of the deceased, might state whether there was any indication of death from any other cause than electricity, so as to negative any other death-producing cause. We therefore find no error in the admission of the testimony complained of under this head.

Second: We have carefully examined the instructions given for plaintiff and find no error. They involve no new principles and a discussion of them is unnecessary.

Third: Defendant offered four instructions which were refused, Nos. 1, 2, 6 and 7. No. 1 was peremptory, directing the jury to find for the defendant, and under the circumstances shown, we think was properly refused. We see no error in rejecting the remaining instructions, as defendant's theory of the case was fairly covered by the instructions given at its instance.

The only substantial error we find is that the court admitted evidence showing a change of the location of the intake to the air line after the explosion; because of this we reverse the judgment, set aside the verdict, and grant defendant a new trial.

*Reversed and remanded.*